

ROBBINS GELLER RUDMAN
   & DOWD LLP
BONNY E. SWEENEY (176174)
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
bonnys@rgrdlaw.com
   – and –
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

LAW OFFICES OF DAVID A. BALTO
DAVID A. BALTO
1350 I Street NW, Suite 850
Washington, DC 20005
Telephone: 202/789-5424
202/589-1819 (fax)
david.balto@yahoo.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

**DMR**

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UPTOWN DRUG COMPANY, INC. d/b/a UPTOWN DRUG AND GIFT SHOP, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>vs.<br><br>CVS CAREMARK CORPORATION, CVS PHARMACY, INC., CAREMARK RX, LLC, and CAREMARK, LLC,<br><br>            Defendants. | No. **12**    **6 5 5 9**<br><br>CLASS ACTION<br><br>COMPLAINT FOR:<br><br>(1) VIOLATION OF UNIFORM TRADE SECRETS ACT, CAL. CIVIL CODE §3426, *ET SEQ.*;<br><br>(2) VIOLATIONS OF CALIFORNIA BUSINESS & PROFESSIONS CODE §17200, *ET SEQ.*;<br><br>(3) INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; AND<br><br>(4) INJUNCTIVE AND DECLARATORY RELIEF.<br><br>DEMAND FOR JURY TRIAL |

VIA FAX

1    Plaintiff Uptown Drug Company, Inc. d/b/a Uptown Drug and Gift Shop, by and through its

2  undersigned attorneys, brings this action on behalf of itself and on behalf of a Class of all others

3  similarly situated, as defined below, against defendants CVS Caremark Corporation ("CVS

4  Caremark"), CVS Pharmacy, Inc., Caremark Rx, LLC, and Caremark, LLC, for compensatory

5  damages and equitable, injunctive and declaratory relief. Plaintiff alleges the following upon

6  information and belief based on the investigation of counsel, except as to those allegations which

7  specifically pertain to plaintiff (which are alleged upon personal knowledge).

8                                    **INTRODUCTION**

9    1.    In 2007, the merger between the country's largest retail pharmacy chain, CVS

10  Corporation, and the country's second largest pharmacy benefit manager ("PBM"), Caremark Rx,

11  Inc., created the eighteenth largest company in the United States, CVS Caremark. PBMs serve as

12  third-party administrators of prescription drug programs, and are primarily responsible for

13  contracting with retail pharmacies that fill PBM plan member prescriptions, processing and paying

14  prescription drug claims, and negotiating discounts and rebates with drug manufacturers. The

15  merger provided CVS Caremark with unprecedented access to patient data that it uses to increase

16  business and profits at the expense of non-CVS retail pharmacies. Because so many of their

17  customers receive drug benefits under PBM prescription plans, every retail pharmacy across the

18  country, including plaintiff and Class members, must do business with CVS Caremark's PBM

19  business, even though CVS Caremark's retail pharmacy outlets (CVS pharmacies) are direct

20  competitors with non-CVS pharmacies.

21  2.    CVS Caremark handles more than 1.4 billion prescriptions annually, and its retail

22  pharmacy segment alone filled approximately 658 million prescriptions in 2011. When a non-CVS

23  retail pharmacy fills a prescription and submits a claim for payment to CVS Caremark's PBM

24  business, the pharmacy must submit certain customer information, including without limitation the

25  name, address, date of birth and gender of the patient, the identity of the patient's prescribing

26  physician, the prescription data, including medication and dosage, and the pharmacy that dispensed

27  the prescription drugs to the patient. This information is protected health information and is required

28  to be kept confidential under the Health Insurance Portability and Accountability Act ("HIPAA").

3.      Plaintiff and each retail pharmacy Class member owns trade secrets in their patient lists, prescription files and patient information. Such information derives independent economic value because it is not generally known or readily ascertainable to other persons who can obtain economic value from its disclosure or use, and it is the subject of reasonable efforts by plaintiff and Class members to maintain its secrecy.

4.      CVS Caremark's PBM operation does not use this customer information to simply process prescription claims. CVS Caremark compiles the information submitted by non-CVS retail pharmacies to form a complete medical profile of the patient and discloses this profile to its retail pharmacy operations without the non-CVS pharmacies' consent. CVS Caremark then improperly utilizes these complete medical profiles for its own financial gain to market products and services to plaintiff and Class members' patients, using the trade secret information to tailor their marketing pitches.

5.      As part of the merger, CVS Caremark committed to establishing firewalls between its PBM and pharmacy operations in order to keep the activities of its own pharmacies separate from its PBM arm, which processes prescriptions from both CVS and competing pharmacies. It also vowed in its Code of Conduct that the firewalls would "separate and protect competitively sensitive information that each business possesses." These firewalls were designed to prevent the improper and unlawful transfer of confidential information, and in theory, would minimize the inevitable conflict of interest between CVS Caremark's retail pharmacy and PBM businesses. CVS Caremark's Code of Conduct even admits that the firewalls are important in contract negotiations, where its businesses must compete on the same terms as their competitors.

6.      But in complete disregard for its firewall policies, CVS Caremark collects proprietary patient information it receives from non-CVS pharmacies and transfers that same information to its own CVS pharmacies, mail order pharmacies, call centers and/or other business segments to target potential new customers that are currently using competing pharmacy services such as plaintiff's and Class members'. CVS Caremark then solicits those customers' business to CVS-owned pharmacies to purchase their prescription drugs as well as thousands of other products available in the stores.

7.   CVS Caremark has also established pharmacy networks through programs such as "Maintenance Choice" that, ironically, require patients to fill their prescriptions for maintenance medications at only CVS Caremark-owned retail and mail pharmacies or face increased co-pays, or even require patients to pay full price for medications, when filling their prescriptions. This is in spite of public assurances by CVS Caremark's CEO, prior to the merger, that "[w]e'll be agnostic [about] where the consumer fills their prescriptions." The program has had the effect of shifting maintenance prescriptions dispensed by CVS Caremark's PBM business into CVS retail pharmacies, as evidenced by the fact that CVS retail pharmacies are getting an increasing share of prescription revenues from claims processed by CVS Caremark's PBM business.  By 2012, 32% of reported prescription revenue at CVS pharmacies came from CVS Caremark, up from 12% in 2007.

8.   This arrangement exacerbates the inherent conflict of interest that arises when CVS Caremark fills prescriptions through its own stores while simultaneously reimbursing rival pharmacies through its PBM operations. CVS Caremark cannot help but favor its own pharmacies over its competition – which is exactly what it said it would not do.  The result is that patients with long-standing relationships with local pharmacies are forced to fill their prescriptions at CVS pharmacies rather than their pharmacy of choice.  In conjunction with misappropriating and exploiting non-CVS pharmacies' patient information for its own financial benefit, CVS Caremark's Maintenance Choice program and other unfair business practices detailed herein are driving independently owned and other retail pharmacy chains out of business.

9.   CVS Caremark's blatant misappropriation of non-CVS retail pharmacies' trade secrets, abuse of private patient information and other anticompetitive conduct is well documented and is the subject of regulatory scrutiny. In 2009, the Federal Trade Commission ("FTC") opened an investigation into CVS Caremark's practices after some legislators, labor unions, pharmacies and consumer groups raised concerns about anticompetitive and anti-consumer business practices. Similarly, in March 2010 CVS Caremark learned that 24 states, the District of Columbia and the County of Los Angeles were conducting a multi-state investigation into practices similar to those being probed in the FTC inquiry. Earlier this year, the FTC investigation resulted in a multi-million

1   dollar fine levied against CVS Caremark for fraudulent misrepresentations of Medicare Part D

2   prescription drug pricing.

3                    **INTRADISTRICT ASSIGNMENT**

4        10.    A substantial part of the events or omissions which give rise to the claims in this

5   action occurred in the county of San Francisco, and as such this action is properly assigned to the

6   San Francisco division of this Court.

7                    **JURISDICTION AND VENUE**

8        11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 and the Class

9   Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2). The matter in controversy in this class action

10   exceeds $5,000,000, exclusive of interest and costs, and some members of the Class are citizens of

11   states other than the states in which defendants are incorporated and have their principal places of

12   business. In addition, pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over

13   plaintiff's state law claims.

14        12.    This Court has personal jurisdiction over defendants because they are authorized to do

15   business and have conducted substantial business in the state of California. All defendants have offices

16   in California, and have significant business contacts with this state. Each of the defendants has

17   sufficient minimal contacts with California or otherwise intentionally avails itself of the consumer

18   markets within California through advertising and marketing activities in California so as to render the

19   exercise of jurisdiction by California courts permissible.

20        13.    Venue is proper in this district pursuant to 28 U.S.C. §1391(a) and (b), because a

21   substantial part of the events or omissions giving rise to plaintiff's claims occurred in this judicial

22   district. Venue is also proper under 18 U.S.C. §1965(a) because defendants transact substantial

23   business in this district.

24                      **THE PARTIES**

25   **Plaintiff**

26        14.    Plaintiff Uptown Drug Company, Inc. d/b/a/ Uptown Drug and Gift Shop ("Uptown

27   Drug") is a California corporation that conducts business as an independent community pharmacy at

28   444 Flower Street, Suite 100, Los Angeles, California. The co-owner, Gerald G. Shapiro, is a

CLASS ACTION COMPLAINT                          - 4 -

1   California licensed and practicing pharmacist. Uptown Drug is registered and qualified to do

2   business in the state of California. Uptown Drug is a qualified provider under defendants' various

3   pharmacy benefit management programs. However, the present cause of action does not arise under

4   the provider agreements between this plaintiff and one or more of the defendants.

5   **Defendants**

6       15.   Defendant CVS Caremark Corporation is a corporation organized and existing under

7   the laws of Delaware, and which has its principal place of business at One CVS Drive, Woonsocket,

8   Rhode Island 02895. CVS Caremark conducts business in California, derives significant revenue

9   from California, and is subject to being sued in California.

10      16.   CVS Pharmacy, Inc. is a corporation organized and existing under the laws of the

11   state of Rhode Island, and which has its principal place of business in the state of Rhode Island.

12   CVS Pharmacy, Inc. is a citizen of the state of Rhode Island but has registered to do business and is

13   doing business in California, and is subject to being sued in California.

14      17.   Caremark Rx, LLC is a limited liability company organized and existing under the

15   laws of Delaware with its principal place of business in the state of Tennessee. Caremark Rx, LLC's

16   sole member is CVS Pharmacy, Inc. Caremark Rx, LLC conducts business in California, derives

17   significant revenue from California, and is subject to being sued in California.

18      18.   Caremark, LLC is a limited liability company organized and existing under the laws

19   of the state of California with its principal place of business in the state of Tennessee. Caremark

20   LLC's sole member is Caremark Rx, LLC. Caremark, LLC conducts business in California, derives

21   significant revenue from California, and is subject to being sued in California.

22      19.   CVS Caremark; CVS Pharmacy, Inc.; Caremark Rx, LLC; and Caremark, LLC are

23   referred to herein collectively as "defendants."

24                        **FACTUAL ALLEGATIONS**

25   **Plaintiff and Class Members are California Retail Pharmacies**

26      20.   There are more than 65,000 retail pharmacies in the United States with over 5,600 of

27   them located in California. Plaintiff and the proposed class consist of retail pharmacies, both

28   independent and chain pharmacies, located in California.

21. Retail pharmacies such as the plaintiff and Class members are essential to the healthcare delivery system. Retail pharmacies, including independent pharmacies, are among the most accessible and trusted sources of health care for many patients across the country. Annually, all retail pharmacies (independents and chains) fill 4 billion prescriptions across the country. Independent pharmacies dispense 1.45 billion prescriptions annually. A single retail pharmacy will dispense an average of 62,969 prescriptions each year (over 170 prescriptions per day).

22. Non-CVS pharmacies and CVS-owned pharmacies are each engaged in the retail pharmacy business and are direct competitors with each other.

**CVS Caremark's Corporate Structure**

23. Through its Retail Pharmacy segment, CVS Caremark owns and operates approximately 7,300 retail CVS pharmacy locations with over 800 located in California. Each is wholly-owned, directly or indirectly, by defendant CVS Pharmacy Inc. CVS Caremark's retail pharmacy operations operate under the banner of CVS/pharmacy. CVS/pharmacy is the nation's largest retail pharmacy chain and generates over two-thirds of its revenues from the sale of prescription drugs. With over 68 million active cardholders, CVS/pharmacy's "ExtraCare" program is one of the largest retail card loyalty programs in the country.

24. CVS Caremark's Pharmacy Services segment provides prescription benefit management services, including mail order and specialty pharmacy services, plan design and administration, formulary management and claims processing. As a PBM, CVS Caremark provides pharmacy benefit management services, including managing the dispensing of pharmaceuticals through its network of mail-order, specialty and retail pharmacies, to participants of its clients' benefit plans. The Pharmacy Services business generates net revenues primarily by contracting with clients, including employers, government employee groups and other health benefit plan sponsors, to provide prescription drugs to plan members or enrollees. CVS Caremark has approximately 2,200 plan clients with 53 million members.

25. The CVS Caremark Pharmacy Services segment operates through subsidiaries including defendant Caremark Rx, LLC, defendant Caremark, LLC and various other affiliates and subsidiaries.

**CVS Caremark Obtains Proprietary Customer
Information Through Its Pharmacy Benefits Business**

26. When a customer fills a prescription at a pharmacy, he or she will provide an insurance card to the pharmacist if the customer's prescription is covered by insurance. The pharmacy then transmits the insurance coverage information to CVS Caremark's PBM operation, which verifies the insurance and determines if the consumer's insurance plan covers the prescribed drug. If so, CVS Caremark's PBM operation determines three amounts: (a) any consumer co-payment; (b) how much the PBM operation will reimburse the pharmacy to dispense the drug; and (c) how much the PBM operation will bill the plan sponsor for the transaction.

27. In order to adjudicate the patient's claim, CVS Caremark requires that the retail pharmacy supply several pieces of information to CVS Caremark, including the name, address, date of birth, and gender of the patient; the identity of the patient's prescribing physician; the prescription data such as medication and dosage; and the pharmacy that dispensed the prescription drugs to the patient. The network then transmits this information back to CVS Caremark's corporate offices for claims processing.

**Defendants Must Protect Plaintiff's and Class Members'
Proprietary and Confidential Customer Information**

28. Both CVS pharmacies and plaintiff's and Class member' pharmacies are required by law to keep their proprietary customer information confidential. All retail pharmacies are subject to the standards and regulations of HIPAA, which includes rules governing the privacy and security of health-related information.

29. Congress passed HIPAA in 1996 "to improve . . . the efficiency and effectiveness of the health care system . . . by encouraging the development of a health information system through the establishment of standards and requirements for the electronic transmission of certain health information." Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, §261, 110 Stat. 1936, 2021-22; *see also* 65 Fed. Reg. 82, 462 (Dec. 28, 2000) (One major purpose of the Privacy Rule is "to improve the efficiency and effectiveness of health care delivery by creating a national framework for health privacy protection that builds on efforts by states, health systems, and individual organizations and individuals.").

30. The HIPAA Privacy Rule "requires appropriate safeguards to protect the privacy of protected health information, and sets limits and conditions on the uses and disclosures that may be made of such information without patient authorization." "Covered entities" are subject to the Privacy Rule. 45 C.F.R. §160.102.

31. Covered entities are health plans, health care clearinghouses and health care providers that transmit any health information in electronic form in connection with a covered transaction. 45 C.F.R. §160.103. As of February 17, 2010, business associates of such entities are also subject to the Privacy Rule. American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, §§13401(a), 13404(a), 123 Stat. 115, 260-61, 264-65.

32. Pharmacies are health care providers for purposes of qualifying as covered entities under the HIPAA Privacy Rule. Further, PBMs that act as business associates of a health plan or health care provider are also covered entities under the HIPAA Privacy Rule. As defendants operate retail pharmacies and act as a PBM, they are all covered entities for purposes of the HIPAA Privacy Rule.

33. Covered entities are required to ensure the confidentiality and integrity of all electronic protected health information that they create, receive, maintain or transmit, and to protect against any reasonably anticipated threats or hazards to the security or integrity of such information. The HIPAA Privacy and Security Rules, 45 C.F.R. Parts 160 and 164, expressly forbid covered entities such as the defendants from using and disclosing protected health information in the manner complained of here. The civil and criminal penalties for defendants' violations of HIPAA are codified in 42 U.S.C. §§1320d-5 and 1320d-6.

34. "Protected health information" or "PHI" is individually identifiable information, whether transmitted orally or recorded in any other form or medium, including demographic information, related to the past, present, or future physical or mental health or condition, the provision of health care to an individual, or the past, present, or future payment for such health care, which is created or received by a covered entity. 45 C.F.R. §160.103.

35. Defendants know that PHI includes patients' "names, addresses, dates of birth, phone numbers, social security numbers, medical diagnoses and prescription histories," all of which are

1  received from plaintiff and Class members for claims adjudication and then unlawfully disclosed and

2  used for the financial gain of CVS Caremark's retail pharmacies, mail order pharmacies and other

3  business segments.

4      36.    CVS/pharmacy, including CVS retail outlets, CarePlus retail outlets and CVS.com, is

5  part of an affiliated group of pharmacies that are owned by CVS Caremark and that treats itself as a

6  single entity for purposes of using and disclosing protected health information.

7      37.    Similarly, CVS Caremark's mail and specialty pharmacies are also part of an

8  affiliated group of pharmacies that are owned by CVS Caremark and treat themselves as a single

9  entity for purposes of using and disclosing protected health information.

10     38.    Defendants are also aware that they must protect "personally identifiable information"

11  ("PII") about a patient. CVS Caremark describes such information in its Code of Conduct as follows:

12         PII is any piece of information which can potentially be used to uniquely identify,
           contact or locate a single person. It includes the demographic information associated
13         with PHI, as well as other unique identifiers such as credit card data, email addresses,
           driver's licenses, fingerprints or handwriting.
14
    The CVS Caremark Code of Conduct further states:
15
               It is critical that those we serve – including colleagues who also may be
16         utilizing our retail or pharmacy services – are able to count on us to protect their
           personal and health information. . . . [T]he people we serve trust CVS Caremark to
17         use their PHI and PII only for purposes of providing our services to them.

18     39.    The information about plaintiff's and Class members' patients that CVS Caremark's

19  PBM operation receives also constitutes a "means of identification" of those patients under 18

20  U.S.C. §1028(d). It is a violation of 18 U.S.C. §1028(a)(7) to knowingly possess, transfer, and/or

21  use this information, without lawful authority, with the intent to commit, or to aid or abet, or in

22  connection with, unlawful activity constituting a violation of federal HIPAA laws.

23     40.    As discussed above, CVS Caremark committed to implementing firewalls between its

24  PBM business and its retail pharmacy business in order to prevent the type of misconduct and blatant

25  conflict of interest described herein. Upon information and belief, the FTC required or urged CVS

26  Caremark to institute such firewalls. In its Code of Conduct, CVS Caremark claims that it

27  "maintains firewalls between select businesses within the Company to separate and protect certain

28  competitively sensitive information that each business possesses." CVS Caremark further admits

CLASS ACTION COMPLAINT                                                                    - 9 -

1    that "[t]hese firewalls become important in contract negotiations, where the businesses must compete

2    on the same terms as their competitors."

3         41.    CVS Caremark uses confidential patient information and confidential business data

4    derived from plaintiff and other Class members for marketing activities unrelated to any treatment

5    purpose. After the defendants compile and mine plaintiff's and Class members' proprietary patient

6    lists and the patient's protected health information, defendants target and direct market their retail

7    pharmacy and mail-order pharmacy services to those patients.

8         42.    In addition, when a patient fills his or her prescription at a non-CVS store, CVS

9    Caremark then directly communicates with such patient, offering the patient an "ExtraCare" loyalty

10    card for discounts on over-the-counter products which are valid only at CVS retail pharmacies or on

11    CVS's website. This marketing does not in any way relate to CVS's PBM operation; it is purely for

12    the financial and competitive advantage of CVS Caremark's retail pharmacy subsidiaries and its

13    direct consumer services.

14         43.    Plaintiff's and Class members' pharmacy patient lists, including the demographic

15    information and prescription history of each patient, are proprietary and confidential. Plaintiff and

16    Class members only disclose such information to CVS Caremark's PBM operation for the purpose

17    of claims adjudication, and the Pharmacy Services segment is required to keep such information

18    confidential, and to only use it for the authorized purpose of pharmacy benefits management.

19         44.    CVS Caremark knows plaintiff's and Class members' patient data is kept secret by

20    and is valuable to plaintiff and Class members. To be sure, CVS Caremark considers this same

21    category of information, which it obtains from its own retail pharmacy patients, to be "some of [CVS

22    Caremark's] most valuable business assets." CVS Caremark admits that this information "might be

23    of use to competitors or harmful to the Company or those we serve if disclosed to others." CVS

24    Caremark describes this "proprietary information" as information that "might give our competitors

25    an advantage if disclosed to them." Yet CVS Caremark uses plaintiff's and Class members'

26    proprietary patient lists and the integrated protected health information, along with the personally

27    identifiable information, to target their patients and even worse, to target plaintiff and Class

28

CLASS ACTION COMPLAINT                              - 10 -

1  members themselves for acquisition and/or to scout new locations for new CVS retail pharmacies or

2  locations to relocate existing CVS pharmacies.

3      45.    Moreover, defendants have knowingly possessed, transferred, and/or used this

4  information, without lawful authority, with the intent to commit, or to aid or abet, or in connection

5  with, unlawful activity constituting a violation of federal HIPAA laws in violation of 18 U.S.C.

6  §1028(a)(7).

7      46.    Defendants' misconduct not only violates federal HIPAA laws and 18 U.S.C. §1028,

8  but also the requirements CVS Caremark imposed, or imposed at the FTC's urging, as a result of the

9  merger. Defendants either intentionally failed to implement, or are intentionally circumventing, this

10 firewall to misappropriate and misuse confidential and proprietary information.

11     47.    Despite defendants' full knowledge of the proprietary and protected nature of this

12 information, as well as their clear understanding of the limited purposes and terms of plaintiff's and

13 Class members' disclosures of such information, they nevertheless unlawfully appropriate, disclose,

14 and misuse the information in order to gain a competitive and financial advantage. This misconduct

15 by defendants violates the California Uniform Trade Secrets Act, Cal. Civ. Code §3426, *et seq.*,

16 multiple HIPAA regulations, California's Unfair Competition Law, 28 U.S.C. §1028(a)(7) (relating

17 to fraud and related activity in connection with a means of identification), the firewall imposed as

18 part of the CVS/Caremark merger, and constitutes a willful misappropriation of plaintiff's and Class

19 members' proprietary and trade-secret patient lists and information.

20 **Defendants Purchase Hundreds of Pharmacies**
   **and Their Customer Lists Each Year**

21
22     48.    CVS Caremark has an ongoing program of purchasing independent pharmacies by

23 purchasing their patient lists. In 2009, CVS Caremark purchased approximately 250 independent

24 pharmacies by purchasing their patient lists. In mid-2010, CVS Caremark stated its intention to

25 purchase approximately 200 independent pharmacies each year going forward. As stated by CVS

26 Caremark's CEO in 2010: "[W]e'll buy about 200 independents a year consistently. It's just the

27 situation. It's just tough for them to survive, right? So we're going to continue to do that and we

28 don't operate the stores. We move them into our stores." As recently as February 2012, CVS

1   Caremark predicted that its pharmacy revenues would continue to be a critical part of its business

2   due in part to its "ongoing program of purchasing customer lists from independent pharmacies."

3       49.     It is not just independent pharmacies that CVS Caremark seeks to acquire.   On

4   October 20, 2008, CVS Caremark acquired 529 Longs retail drug stores located mostly in California,

5   but also in Hawaii, Nevada and Arizona.   According to CVS Caremark's CFO David Rickard, the

6   acquisition "directly addresses the central and northern California markets and gives us access to

7   those consumers."

8       50.     The fact that CVS Caremark intends to purchase non-CVS pharmacies renders

9   plaintiff's and Class members' patient information even more sensitive.

10      51.     The information supplied by plaintiff's and Class members' patients is confidential.

11  Patients supply this information to plaintiff and Class members because it is required in order to fill

12  their prescriptions.   Non-CVS pharmacies must transmit confidential patient information to CVS

13  Caremark in order to have CVS Caremark adjudicate the claim and process payment.   However,

14  once CVS Caremark obtains this information, it misuses the information to target market the

15  pharmacy services of CVS Caremark-owned retail and mail-order pharmacies, as well as to sell its

16  knowledge of the patient population to drug makers so that they may also directly market to the

17  patient population. As a result, patients who believe only their doctor and their pharmacy know their

18  medical condition and the prescriptions they are taking are receiving various forms of direct

19  marketing from CVS Caremark leading to the assumption that the plaintiff and Class members are

20  behind the marketing campaign.

21  **CVS Caremark Violates California's Unfair Competition
    Law Through Its Restrictions of a Patient's Preferred Pharmacy**

22      52.     CVS Caremark (CVS Caremark through Caremark Rx, LLC, Caremark, LLC and

23  related subsidiaries and affiliates involved in the PBM operation of CVS Caremark) violates

24  California's Unfair Competition Law by seeking to contractually limit patients' access to a

25  community pharmacy.

26      53.     CVS Caremark's PBM operation (CVS Caremark through Caremark Rx, LLC,

27  Caremark, LLC and related subsidiaries and affiliates involved in the PBM operation of CVS

28

CLASS ACTION COMPLAINT                                                                      - 12 -

1  Caremark) contracts with insurers and plan sponsors to form pharmacy networks that exclude non-
2  CVS retail pharmacies outright and/or provide incentives to exclude non-CVS pharmacies through
3  lower co-payments and or other similar means. As the entity that forms the network of pharmacies,
4  CVS Caremark's PBM operation has the power to act as gatekeeper to the market of patients that is
5  formed through a private health plan. It is to CVS Caremark's direct benefit to structure a restricted
6  network. As stated on May 15, 2009 by CVS Caremark's then-Chief Financial Officer: "CVS
7  Caremark has a full voice in structuring the product. Why would we structure it any other way? . . .
8  If it wasn't more profitable for us to fill it at retail, we wouldn't do it that way."

9      54.    For example, CVS Caremark leverages this role as gatekeeper to the particular health
10 plan's patient market by accepting payments from drug companies called "market share rebates."
11 "Market share rebates" are payments by drug makers to CVS Caremark's PBM operation based on
12 the sales of the manufacturers' drugs to members of the plans administered by CVS Caremark. Such
13 payments are based on measures of the manufacturers' "market share." Market share is calculated
14 by taking the number of prescriptions or units of all drugs dispensed in the defined market class
15 during the same time period. CVS Caremark unleashes the marketing operation described above to
16 increase the share of the plan's patient market that takes the drug of the manufacturer making the
17 rebate payment.

18     55.    CVS Caremark also uses its PBM role in forming pharmacy networks and
19 prescription benefit plans to favor CVS Caremark-owned pharmacies. As a result, CVS Caremark
20 captures the health plan's market of members for its CVS Caremark-owned pharmacies.

21     56.    These networks exclude and/or discriminate against non-CVS pharmacies in the sale
22 of maintenance medications used to treat chronic conditions such as high cholesterol, high blood
23 pressure, or diabetes. Every year, these maintenance medications typically account for the most
24 prescriptions and highest source of pharmacy revenues. Approximately one half of Americans take
25 one or more prescription medications to treat chronic conditions, and these chronic medications
26 account for 91% of all prescriptions filled by retail pharmacies.

27     57.    "Maintenance Choice" is the term CVS Caremark uses, ironically, to describe its
28 program of contracting with health plans to form exclusive pharmacy networks made up of CVS

CLASS ACTION COMPLAINT                                                                    - 13 -

1   Caremark's own mail order pharmacy and CVS retail pharmacies. Patients are forced to leave their

2   preferred pharmacy for CVS Caremark mail order pharmacies or CVS retail pharmacies. For

3   example, as described in a March 2010 *Fortune* article, Sylvia Everett, a retired teacher in Aransas,

4   Texas, was upset when her 99-year-old mother was not allowed to fill a Nexium prescription at her

5   local pharmacy that she had used for decades. After calling CVS Caremark, Ms. Everett was told

6   that she "can get it at CVS," even though there are no CVS pharmacies in her town.

7       58.     Currently, CVS Caremark provides an immensely burdensome opt-out process for

8   plan members who wish to fill their maintenance prescriptions at non-CVS pharmacies. This

9   includes opting-out for each medication each plan year and paying a higher retail co-pay for each

10  medication. If patients continue ordering 30-day supplies of long-term medications without calling

11  CVS Caremark first, they will pay the full cost of their prescriptions. These opt-out provisions are

12  essentially illusory and have the effect of eliminating patients' preferred choice of pharmacies by

13  forcing them to fill their prescriptions at CVS retail and mail-order pharmacies.

14      59.     On February 8, 2010, one of defendants' officers voiced criticisms of mandatory mail

15  programs even though Maintenance Choice similarly restricts patient choice. He said: "And you

16  know we listed some of them before, but the mail service model that I've been involved in for almost

17  20 years now, that model has basically sort of grown, largely in the past decade by putting in benefit

18  designs that are quite disruptive to the members, where they literally cease to have coverage if they

19  stay at the retail stores." Prior to CVS merging with Caremark, an officer of CVS acknowledged

20  that networks that limit the patient's ability to go to their local pharmacy are "anti-competitive." In

21  2004 he stated: "However, we are opposed to forcing patients to use a mail order service and then

22  dictating which mail order pharmacy to use. At best, this practice eliminates patient choice and

23  deprives them of the opportunity to obtain personal counseling from a pharmacist. At worst, it is

24  unfair and anticompetitive."

25      60.     For long-term medication needs typically prescribed for chronic conditions, plan

26  members can only obtain these drugs from either CVS Caremark Mail Service Pharmacy or a CVS

27  pharmacy retail location. There are almost 450 medications on this list, including top sellers such as

28  Nexium, Simvastatin, Advair Diskus, Singulair, Seroquel, Spiriva, Actos, Abilify, Cymbalta,

CLASS ACTION COMPLAINT                                                              - 14 -

1    Crestor, Diovan, Lisinopril, Metformin, Symbicort and Vesicare. These drugs account for 44 of the

2    top 100 most prescribed medicines (2011) and 33 of the top 100 prescription products by dollars

3    spent (2011).

4         61.    To date, more than 525 of CVS Caremark's clients representing more than 6.3 million

5    covered lives have adopted Maintenance Choice. Other CVS Caremark clients have adopted similar

6    forms of restricted networks.

7         62.    In addition, in 2011 CVS Caremark announced that it would manage the pharmacy

8    benefit for Aetna health plans and seek to establish Maintenance Choice and other restricted

9    networks for Aetna health plans. According to public statements made by CVS Caremark, the

10   implementation of this new role began in January 2011.

11        63.    As a result of Maintenance Choice and similar restricted networks, patients of

12   plaintiff and Class members are forced to go to plaintiff's and Class members' direct competitor to

13   obtain their maintenance medications. Another result is that CVS pharmacies have increased their

14   share of prescription revenues from claims processed by CVS Caremark's PBM business at the

15   expense of plaintiff and Class members. In 2009 alone, Maintenance Choice accounted for more

16   than half of same-store sales growth in the CVS retail pharmacy business.



**Share of Retail Prescription Revenues at CVS Retail Pharmacies from CVS Caremark's PBM business, 2007 to 2012**

| Year | Share |
|------|-------|
| 2007 | 12% |
| 2008 | 16% |
| 2009 | 21% |
| 2010 | 22% |
| 2011 | 28% |
| 2012 (YTD) | 32% |

Source: Pembroke Consulting analyses of company SEC filings.

Published on Drug Channels (http://www.DrugChannels.net) on November 13, 2012.

PEMBROKE
CONSULTING

64.  One of the purposes of Maintenance Choice is to have patients of non-CVS pharmacies move all their prescriptions (both maintenance and acute prescriptions) to CVS Caremark-owned mail and retail pharmacies.  As David Rickard, then Chief Financial Officer of CVS Caremark, stated in 2009: "Any transfer of 30-day CVS scripts to 90-day CVS Caremark scripts is more than offset by our gain in share of non-CVS 30-day maintenance scripts at mail or retail, plus our gain in share from our non-CVS 30-day acute scripts, as people choose to aggregate all their scripts at the most convenient pharmacy."

65.  Once CVS has successfully moved patients to CVS Caremark-owned mail and retail pharmacies, CVS aims to keep those patients there by automatically refilling maintenance medications even when the patient does not authorize the refill.  *See* David Lazarus, *Don't Need That Drug Refill? Here is it Anyway*, L.A. Times, Oct. 5, 2012; *see also* David Lazarus, *CVS Customers Say Prescription Refills Weren't OKed*, L.A. Times, Oct. 9, 2012.

**CVS Caremark Has a Long History of Violating Patient Privacy and Unfairly Competing for Patients**

66.  The practice of CVS Caremark in violating the privacy of patients and unfairly competing with its rivals is well documented.  From 2007 to 2009, the FTC conducted an investigation into allegations that CVS Caremark discarded patient information improperly such that it would be publicly accessible. *See In the Matter of CVS Caremark Corp.*, FTC File No. 072-3119 (FTC). CVS Caremark privacy officer Christine Egan admitted, "We are not safeguarding customer privacy as we are required to do. . . . It's sad and intolerable." CVS Caremark entered into a settlement and consent decree as a result and paid a $2.25 million fine to settle a companion investigation by the U.S. Department of Health and Human Services for related HIPAA violations. From 2004 to 2008, 28 different states investigated allegations that Caremark hired itself out to drug companies to target patients to switch to the pharmaceutical maker's drugs. *See, e.g., California v. Caremark Rx, LLC*, No. 37-2008-00077952-CU-MC-CTL (Cal. Super. Ct., S.D. Cty.). Again, CVS Caremark entered into a consent decree with the states and agreed to pay $22 million to settle the claims.  Moreover, in 2011, CVS Caremark entered into a settlement with the United States and other states to settle charges that it knowingly submitted false prescription claims to government

1 health programs in violation of the False Claims Act, 31 U.S.C. §§3729-3733. CVS Caremark

2 agreed to pay $17.5 million. *See United States and State of California, ex rel. LeFlore v. CVS*

3 *Caremark Corp.*, No. 08-CV-574 (W.D. Wis.).

4     67.     As discussed above, the FTC, 24 states, the District of Columbia and the County of

5 the Los Angeles all instituted investigations beginning in 2009 and 2010 regarding anticompetitive

6 and anticonsumer business practices in the aftermath of the CVS/Caremark merger. On January

7 2012, CVS Caremark was fined $5 million by the FTC because it knowingly misrepresented prices

8 of Medicare Part D prescription drugs at CVS and Walgreen pharmacies. *See In the Matter of CVS*

9 *Caremark Corp.*, FTC File No. 112-3210 (FTC).

10     68.     As recently as October 2012, the California Board of Pharmacy announced that it was

11 probing complaints that CVS Caremark refilled prescriptions and billed insurance companies

12 without patients' consent.

13                              **CLASS ACTION ALLEGATIONS**

14     69.     Plaintiff brings this action on its own behalf and on behalf of the following Class of

15 similarly situated persons or entities, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of

16 Civil Procedure:

17     All retail pharmacies in California that provided confidential patient information to
     CVS Caremark after March 22, 2007 for purposes of utilizing CVS Caremark's PBM

18     services. Specifically excluded from the Class are defendants; any defendant-owned
     pharmacy; any entity in which any defendants or defendant-owned pharmacies have

19     a controlling interest; and any of the affiliates, legal representatives, heirs, or assigns
     of defendants or defendant-owned pharmacies.

20

21     70.     Plaintiff reserves the right to amend the Class definition if discovery and further

22 investigation reveal that the Class should be expanded or otherwise modified.

23     71.     The Class is composed of thousands of persons, the joinder of which would be

24 impracticable. The identities of the individual members are ascertainable through defendants'

25 records or by public notice.

26     72.     There is a well-defined community of interest in the questions of law and fact

27 involved affecting the members of the Class. The questions of law and fact common to the Class

28

1   predominate over questions affecting only individual members, and include, but are not limited, to

2   the following:

3            (a)     Whether defendants' actions constitute unlawful or unfair business practices

4   through the implementation of programs such as "Maintenance Choice" and by possessing,

5   transferring, and/or using confidential patient information in violation of California law;

6            (b)     Whether plaintiff's and Class members' confidential patient information

7   constitutes protected trade secrets as defined by California law;

8            (c)     Whether defendants misappropriated plaintiff's and Class members'

9   confidential patient information in violation of California law;

10           (d)     Whether defendants' use of plaintiff's and Class members' confidential

11  patient information violates federal and/or California state laws;

12           (e)     Whether defendants interfered with an actual prospective economic

13  relationship between plaintiff and Class members that resulted and likely would have continued to

14  result in an economic benefit to plaintiff;

15           (f)     Whether plaintiff and Class members are entitled to declaratory, injunctive

16  and/or equitable relief; and

17           (g)     Whether plaintiff and Class members are entitled to compensatory damages,

18  including actual and statutory damages.

19       73.    Plaintiff is an adequate representative of the above Class because its interests do not

20  conflict with the interests of the Class members it seeks to represent and it is similarly situated with

21  members of the Class. Plaintiff will fairly and adequately represent and protect the interests of the

22  Class and plaintiff's interests are not antagonistic to the Class's. Plaintiff has retained counsel who

23  are competent and experienced in the prosecution of class action litigation.

24       74.    A class action is superior to other available means for the fair and efficient

25  adjudication of plaintiff's and Class members' claims. Plaintiff and members of the Class have

26  suffered irreparable harm as a result of defendants' unfair and unlawful conduct. Because of the size

27  of the individual Class members' claims, few, if any, Class members could afford to seek legal

28  redress for the wrongs complained herein. Absent the class action, the members of the Class will

CLASS ACTION COMPLAINT                                                                    - 18 -

1 continue to suffer losses and the violations of law described herein will continue without remedy and

2 defendants will be permitted to retain the proceeds of their misdeeds. Defendants continue to deny

3 wrongdoing and to engage in the unlawful and unfair conduct that is the subject of this complaint.

**COUNT I**

**Violation of Uniform Trade Secrets Act, Cal. Civ. Code §3426, *et seq.***
**(Against All Defendants)**

75. Plaintiff incorporates and realleges, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this complaint.

76. California's Uniform Trade Secrets Act ("UTSA"), Cal. Civ. Code §3426, *et seq.*,

prohibits the misappropriation of trade secrets. A "trade secret" under UTSA includes:

> [I]nformation, including a formula, pattern, compilation, program, device, method,
> technique, or process, that: (1) [d]erives independent economic value, actual or
> potential, from not being generally known to the public or to other persons who can
> obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts
> that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code §3426.1(d). A "misappropriation" under UTSA occurs when trade secrets are

acquired, disclosed or used improperly as set forth in the statute. *See* Cal. Civ. Code §3426.1(b).

77. Plaintiff and Class members have spent time and effort to build relationships with

their patients and the communities that they serve. Pharmacists are among the most trusted

professionals because patients know their pharmacists and consult with them about matters affecting

health. Building these relationships not only serves the health of the plaintiff's and Class members'

patients, but the relationships are the true business value of the pharmacies (since pharmacies derive

the vast majority of their revenue from prescriptions).

78. Plaintiff and Class members own trade secrets in their patient lists and customer data,

including their patients' protected health information, which includes their names, genders,

addresses, dates of birth, phone numbers, social security numbers, medical diagnoses and treatment

records, prescription histories, including medications and dosages, and the identity of patients'

prescribing physician and the pharmacy dispensing the drugs. These patient lists and customer data,

including the compilation of protected health information identified above, derives independent

economic value, both actual and potential, from not being generally known to, and not being readily

1  ascertainable by proper means by other persons, such as the defendants, who can unlawfully obtain

2  economic value from the disclosure or use, and despite significant efforts by the plaintiff and Class

3  members to maintain that privacy and secrecy.

4       79.    Plaintiff's and Class members' patient lists and customer data also derives economic

5  value because their disclosure allows plaintiff's and Class members' competitors such as CVS

6  pharmacies to direct sales efforts to customers who have shown a willingness to use a unique

7  product (utilizing pharmacies' prescription and consultation services, etc.) as opposed to people who

8  might only be interested.

9       80.    The trade secret patient lists and integrated patient information were created and

10  compiled by plaintiff and Class members through significant expenditures of time, effort, and

11  expense, and plaintiff and Class members use the information to obtain an advantage over

12  competitors, including CVS Caremark-owned retail and mail-order pharmacies, and are required to

13  keep such information confidential.

14       81.    This information was disclosed to CVS Caremark's PBM operation (CVS Caremark

15  through Caremark Rx, LLC, Caremark, LLC and related subsidiaries and affiliates involved in the

16  PBM operation of CVS Caremark) in confidence and solely for the purpose of adjudicating the

17  prescription claims of plaintiff's and Class members' patients. Defendants improperly use(d) and

18  disclose(d) the trade secret information without the plaintiff's or Class members' authorization in

19  order to direct their sales efforts to plaintiff's and Class members' patients and solicit their business.

20  The defendants have misappropriated and continue to misappropriate for their own use and benefit,

21  using improper means, the confidential patient information supplied to them by the plaintiff and

22  Class members through the claims adjudication process. Such misappropriation of plaintiff's and

23  Class members' trade secrets and confidential patient/customer information violates UTSA.

24       82.    Defendants' conduct discussed above proximately caused and is causing damage to

25  the plaintiff and Class members. As a direct and proximate result of defendants' conduct, defendants

26  have obtained plaintiff's and Class members' valuable property, and have been unjustly enriched

27  thereby. Plaintiff and Class members are entitled to full restitution of their property and

28

CLASS ACTION COMPLAINT

- 20 -

1 disgorgement of all profits obtained by defendants as a result of their unlawful, unfair, and
2 fraudulent acts as alleged herein.

3     83.   Plaintiff and Class members seek recovery of damages for their actual loss due to
4 defendants' misappropriation, the disgorgement of any benefit unjustly received by defendants as a
5 result of their misappropriation, the recovery of exemplary damages for such conduct, and also an
6 injunction against any further dissemination or use of plaintiff's and Class members' trade secrets
7 and confidential patient/customer information.

## COUNT II

### Violation of Cal. Bus. & Prof. Code §17200, *et seq.*
### (Against All Defendants)

10     84.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every
11 allegation set forth in the preceding paragraphs of this complaint.

12     85.   Section 17200 of the California Business & Professions Code ("Unfair Competition
13 Law" or "UCL") prohibits any "unlawful" and "unfair" business practice.

14     86.   Defendants have violated §17200's prohibition against engaging in "unlawful" acts or
15 practices by, as alleged above, misappropriating plaintiff's and Class members' trade secrets,
16 including their confidential and protected health information and other customer data, in violation of
17 UTSA.

18     87.   Defendants' conduct also violates the HIPAA Privacy and Security Rules, 45 C.F.R.
19 Parts 160 and 164, which expressly forbid the defendants from the unauthorized use and disclosure
20 of protected health information for the marketing complained of here, and 18 U.S.C. §1028(a)(7),
21 because defendants have knowingly possessed, transferred, and/or used this information, without
22 lawful authority, with the intent to commit, or to aid or abet, or in connection with, unlawful activity
23 constituting a violation of federal HIPAA laws.

24     88.   Plaintiff and Class members reserve their right to allege other violations of law which
25 constitute other unlawful business acts or practices, as further investigation and discovery warrants.
26 Such conduct is ongoing and continues to this date.

89.     As described above, defendants have violated Cal. Bus. & Prof. Code §17200's prohibition against engaging in "unfair" acts or practices through their improper acquisition, possession, disclosure, transfer and use of plaintiff's and Class members' confidential and protected health information and other consumer data.

90.     Additionally, defendants have violated Cal. Bus. & Prof. Code §17200's prohibition against engaging in "unfair" acts or practices for the reasons set forth below.

91.     The CVS Caremark PBM operation has entered into contracts with at least 525 plan sponsor clients and established pharmacy networks that explicitly exclude pharmacies, including plaintiff, from providing maintenance medications to the members of such plans. In addition, the CVS Caremark PBM operation has entered into contracts with plan-sponsor clients establishing pharmacy networks that provide incentives for the members of such plans to utilize CVS Caremark-owned retail and mail order pharmacies to fill prescriptions for their maintenance medications and correspondingly disincentivizes their use of non-CVS pharmacies.

92.     The agreements between CVS Caremark's PBM operation and its health plan clients contain contractual provisions that improperly and unfairly prohibit and limit a person who is a beneficiary of the policy from selecting a pharmacy or pharmacist of the person's choice

93.     The agreements between CVS Caremark's PBM operation and its health plan clients contain contractual provisions that deny plaintiff and Class members the right to participate as a contract provider under the policy or plan even if the they agree to provide pharmaceutical services that meet all terms and requirements and include the same administrative, financial, and professional conditions that apply to pharmacies and pharmacists who have been designated as providers under the policy or plan.

94.     As non-CVS pharmacies, plaintiff and Class members are excluded from participation in those plans, including a Maintenance Choice or similar network that mandates mail order pharmacy and/or CVS-owned retail pharmacies. In addition, the policies and plans set up by CVS Caremark's PBM operation disfavor and discriminate against non-CVS pharmacies in the sale of maintenance medications in direct violation of California law.

95. Defendants' business practices, as detailed above, are unethical, oppressive and unscrupulous, and they violate fundamental policies of this State. Further, any justifications for defendants' wrongful conduct are outweighed by the adverse effects of such conduct. Thus, defendants engaged in unfair business practices prohibited by Cal. Bus & Prof. Code §17200, *et seq.*

96. Defendants' conduct caused and continues to cause substantial injury to plaintiff and Class members. Plaintiff and Class members have suffered monetary loss and damages as the result of the loss of business from customers that, but for defendants' unlawful and unfair conduct, would have used plaintiff or Class members as their pharmacy of choice. Plaintiff and Class members were harmed because their present and future ownership interest in the monies derived from defendants' unlawful acquisition, disclosure and use of plaintiff's patient information was diminished, as was their interest in the monies derived from its customers who were and are excluded from filling prescriptions with plaintiff and Class members due to defendants' implementation of Maintenance Choice networks that unfairly exclude plaintiff and Class members. Thus, plaintiff and Class members have suffered injury in fact and lost money as a result of defendants' unlawful and unfair conduct.

97. Additionally, pursuant to Cal. Bus & Prof. Code §17203, plaintiff seeks an order forbidding the defendants from excluding plaintiff and Class members from such networks, and permitting participation on equal terms to CVS-owned retail pharmacies, and requiring defendants to return the full amount of money improperly collected to all those who have paid them. Unless defendants are enjoined from continuing these unlawful and unfair business acts or practices, plaintiff and Class members will suffer irreparable injury in the form of continued loss of money as a result of defendants' conduct as described herein.

## COUNT III

### Interference with Prospective Economic Advantage
### (Against All Defendants)

98. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

1      99.    Defendants interfered with an actual prospective economic relationship between

2  plaintiff and Class members that had resulted and likely would have continued to result in an

3  economic benefit to plaintiff and Class members.

4      100.    Defendants either knew or should have known of the relationship between their

5  policy beneficiaries and the plaintiff and Class members, as defendants were aware that their

6  beneficiaries were using the plaintiff's and other Class members' pharmacy services for their

7  prescription needs.

8      101.    Plaintiff and Class members had established relationships with numerous

9  beneficiaries of defendants who frequently and regularly utilized their services.

10     102.    Defendants intended to disrupt the relationship between plaintiff and defendants'

11  beneficiaries when defendants used plaintiff's proprietary and confidential patient information to

12  target its patients and unlawfully required patients to have prescriptions filled at CVS pharmacies as

13  opposed to the pharmacies of their choice, which would have been plaintiff's or Class members'

14  pharmacies, thereby not permitting patients to use plaintiff's or Class members' services to treat their

15  medical needs under their prescription drug benefits plans.

16     103.    Additionally, defendants knew or should have known that their actions would disrupt

17  this relationship if defendants failed to act with reasonable care.

18     104.    In misappropriating plaintiff's and Class members' proprietary information and data

19  for its financial gain at the expense of plaintiff and Class members, and in excluding community

20  pharmacies from the network for services to defendants' beneficiaries, defendants failed to act with

21  reasonable care.

22     105.    Defendants' actions, which substantially competitively disadvantaged plaintiff and

23  Class members, therefore disrupted the existing or prospective relationship between plaintiff and

24  Class members and defendants' beneficiaries.

25     106.    Defendants' actions have created and will continue to create economic injury and

26  harm to plaintiff and Class members.  Defendants' wrongful conduct is a substantial factor in

27  causing plaintiff's and Class members' harm and is not based on any justifiable cause.

28

107.    As a direct and proximate result of the actions of defendants as described herein and to be established at trial, plaintiff and Class members have been damaged in that they have lost profits from their customers who were unlawfully forced to have prescriptions filled at CVS pharmacies as opposed to the pharmacies of their choice, which would have been plaintiff's and Class members' pharmacies.  Plaintiff and Class members have lost customers and good will, and the resulting value of their businesses has declined as a result of defendants' unlawful misappropriation of their trade secrets and violations of the UTSA and Unfair Competition laws.

108.    Plaintiff and Class members are entitled to monetary damages for their losses as well as pre-judgment interest, attorney fees, and such other general relief to which they are entitled for defendants' wrongful actions.

## COUNT IV

### Injunctive and Declaratory Relief
### (Against All Defendants)

109.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

110.    Plaintiff requests that the Court enter a permanent injunction requiring the admission of plaintiff and Class members into such networks and participation on equal terms to CVS-owned retail and mail-order pharmacies.

111.    Additionally, plaintiff requests that the Court enter a permanent injunction to prevent future violations of HIPAA and other federal and state laws by enjoining defendants from using or disclosing the patient information of plaintiff and Class members except solely for the purpose of adjudication of pharmacy benefit claims.

112.    Additionally, plaintiff requests that the Court enter a permanent injunction to prevent future misappropriation of plaintiff's and Class members' trade secrets and confidential patient/customer information and the unlawful use of such information in defendants' possession.

113.    Plaintiff will likely suffer irreparable injury if its request for an injunction is denied. Specifically, defendants' PBM operation currently contracts with plans that exclude or discriminate against plaintiff and Class members in the filling of maintenance medication and 90+ day scripts.

CLASS ACTION COMPLAINT                                                             - 25 -

1 Additionally, defendants are utilizing the confidential patient information of plaintiff and Class

2 members unlawfully and for the purpose of directly targeting plaintiff's and Class members' patients

3 to switch to a CVS Caremark-owned pharmacy. In both cases, the injury suffered by plaintiff and

4 Class members as a result of such conduct will be irreparable as the relationships built by plaintiff

5 and Class members with their patients are being disrupted and breached. There is no adequate

6 remedy at law for such harm.

7      114. The requested injunctive relief will not adversely affect public policy or the public

8 interest. Rather, the entry of the requested injunctive relief will favorably affect the public interest.

9 Patient health information will be protected in accordance with applicable federal law and the

10 admission of plaintiff into the currently restricted networks.

11      115. Finally, plaintiff requests that the Court issue an order declaring that the contracts

12 and/or provisions in the CVS Caremark PBM operations' contract with plan sponsors that exclude or

13 disfavor plaintiff and Class members are void.

14                                 **PRAYER FOR RELIEF**

15      WHEREFORE, plaintiff, on behalf of itself and all others similarly situated, prays for

16 judgment against defendants as appropriate for the particular Causes of Action:

17      A. For an order declaring this a class action pursuant to Rule 23 of the Federal Rules of

18 Civil Procedure on behalf of the proposed Class described herein and appointing plaintiff to serve as

19 class representative and plaintiff's counsel Robbins Geller Rudman & Dowd LLP and the Law

20 Offices of David A. Balto as Lead Counsel for the Class;

21      B. For an order declaring that the contracts and/or those provisions in the CVS Caremark

22 PBM operations' contract with plan sponsors that exclude or disfavor plaintiff and Class members

23 are void;

24      C. For a preliminary and permanent injunction requiring the admission of plaintiff and

25 Class members into pharmacy networks that exclude them through defendants' unlawful conduct,

26 and requiring non-CVS pharmacy participation on equal terms to CVS-owned retail and mail-order

27 pharmacies;

28

1       D.     For a preliminary and permanent injunction to prevent future violations of Cal. Civ.

2 Code §3426, *et seq.* by enjoining defendants from misappropriating, using or disclosing the patient

3 information of plaintiff and Class members, except solely for the purpose of adjudication of

4 pharmacy benefit claims;

5       E.     For an order awarding plaintiff and Class members all appropriate monetary relief,

6 including: (1) restitution of the monies defendants wrongfully acquired by defendants' wrongful and

7 illegal conduct; (2) disgorgement of monies obtained as a result of defendants' wrongful and illegal

8 conduct; and (3) compensatory and punitive damages, including actual and statutory damages,

9 arising from defendants' wrongful and illegal conduct;

10       F.     For pre-judgment and post-judgment interest as allowed by law;

11       G.     For an award of reasonable attorneys' fees and all costs and expenses incurred in the

12 course of prosecuting this action; and

13       H.     For such other and further relief as this Court may deem just and proper.

14 **JURY DEMAND**

15     Plaintiff demands a trial by jury.

16 DATED: December 28, 2012         ROBBINS GELLER RUDMAN
                                          & DOWD LLP

17                                       BONNY E. SWEENEY

18

19

20                                       BONNY E. SWEENEY

21                                       655 West Broadway, Suite 1900
                                      San Diego, CA 92101-3301

22                                         Telephone: 619/231-1058
                                      619/231-7423 (fax)

23

24                                       ROBBINS GELLER RUDMAN
                                          & DOWD LLP

25                                       SAMUEL H. RUDMAN
                                      58 South Service Road, Suite 200

26                                       Melville, NY 11747
                                      Telephone: 631/367-7100
                                      631/367-1173 (fax)

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF DAVID A. BALTO
DAVID A. BALTO
1350 I Street NW, Suite 850
Washington, DC 20005
Telephone: 202/789-5424
202/589-1819 (fax)

Attorneys for Plaintiff

S:\CptDraft\Other\CPT CVS Caremark2.doc

CLASS ACTION COMPLAINT

- 28 -