United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UPTOWN DRUG COMPANY, INC.,

Plaintiff,

v.

CVS CAREMARK CORPORATION, et al.,

Defendants.

Case No.  12-cv-06559-JST

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL ARBITRATION AND TO STAY ACTION AND GRANTING MOTIONS TO SEAL**

Re: ECF No. 17, 18, 42

In this putative class action for violations of the California Uniform Trade Secrets Act and related claims, Defendants move to compel arbitration and to stay the action pending arbitration. Plaintiff Uptown Drug Company, Inc. ("Uptown") opposes the motion.  For the reasons set forth below, the motion to compel arbitration is GRANTED IN PART and DENIED IN PART and the motion to stay the action pending arbitration is GRANTED.

## I.      BACKGROUND

**A.      The Parties and Claims**

Uptown provides pharmacy services to individuals who participate in certain group health plans.  Compl. ¶¶ 1-2, 14.  These group health plans provide to customers pharmacy benefits that are sponsored, administered, or insured by pharmacy benefit managers ("PBMs").  Id. ¶ 14.

CVS Caremark is a retail pharmacy chain that competes directly with Uptown.[1]  Id. ¶ 1.  CVS Caremark merged with Caremark Rx, the second largest PBM in the country, in 2007.  Id. As a PBM, Caremark Rx fills prescriptions, processes prescription drug claims, negotiates discounts

_____

[1] Defendant CVS Caremark is the corporate parent of Defendant CVS Pharmacy, Inc, which is the sole member of Defendant Caremark Rx, L.L.C.  Mot. at 4, n. 4.  Caremark Rx, L.L.C., in turn, is the sole member of Caremark, L.L.C. and the sole member of CaremarkPCS, L.L.C.  Id.

1    with manufacturers, and performs other functions for PBM plan members.  Id.

2         Uptown has a business relationship with Caremark Rx's PBM branch because many of

3    Uptown's customers receive drug benefits under PBM prescription plans.  Id.  This relationship is

4    governed by a provider agreement, which allows Uptown to fill prescriptions for participants in

5    Caremark's PBM plans at discounted prices and requires Uptown to disclose certain customer

6    information to Caremark Rx whenever it submits claims for reimbursement.

7         Uptown has disclosed customer information to Caremark's PBM operations "in confidence

8    and solely for the purpose of adjudicating [] prescription claims."  Caremark Rx allegedly has

9    disclosed this information without authorization to Caremark's retail pharmacies, which compete

10   directly with Uptown, for the purpose of marketing products and services to Uptown's customers.

11   Id. ¶¶ 4, 47, 81.  These unauthorized disclosures, which allegedly contravene Caremark's own

12   internal policies and the Health Insurance Portability and Accountability Act, have resulted in

13   increased revenues for Caremark's retail pharmacies at the expense of Uptown and other non-CVS

14   pharmacies.  Id. ¶¶ 3-6, 63.

15        Uptown brings this action on its own behalf and on behalf of other similarly situated

16   pharmacies in California against Defendants CVS Caremark, CVS Pharmacy, Caremark Rx, and

17   Caremark, L.L.C. for (1) violations of California's Uniform Trade Secrets Act ("UTSA"); (2)

18   violations of the unlawful prong of California's Unfair Competition Law ("UCL"), California

19   Business and Professions Code section 17200; (3) violations of the unfair prong of the UCL; and

20   (4) interference with prospective economic advantage ("IPEA").[2]  The gravamen of the complaint

21   is that Defendants' unauthorized disclosure of non-CVS pharmacies' customer information

22   constitutes the misappropriation of trade secrets.

23   //

24   //

25   //

26

27   _____

28   [2] The putative class consists of "all retail pharmacies in California that provided confidential
     patient information to CVS Caremark after March 22, 2007 for purposes of utilizing CVS
     Caremark's PBM services."  Compl. ¶ 69.

**B.      Provider Agreements and Manuals**

In 1995, Uptown entered into an agreement with PCS Health Systems ("the PCS Provider Agreement"), which is a PBM that ultimately became Caremark PCS Health in 2008 as a result of various acquisitions and mergers.[3]  Pagnillo Decl. ¶ 14 & Ex. A, ECF No. 18;[4]  Request for Judicial Notice ("RJN"), Ex. A, B., ECF No. 19.[5]  The agreement allowed Uptown to be included in PCS Health's PBM networks.  See generally Pagnillo Decl., Ex. A.

PCS Health retained the right to amend the PCS Provider Agreement at any time as long as it gave notice to the pharmacy providers, including Uptown, no less than 30 days before enacting any amendment.  Pagnillo Decl., Ex. A ¶ 1.3.  The PCS Provider Agreement contained an arbitration clause and incorporated by reference a PCS Manual.  See Pagnillo Decl., Ex. A ¶ 9.5 (arbitration clause); id. ¶¶ 1.3, 9.7 (provider manual).

The PCS Provider Agreement and the incorporated PCS Manual have been amended several times as a result of multiple mergers and acquisitions.[6]  Each time, PCS Health's

_____

[3] PCS Health Systems was owned by Rite Aid Corporation until it merged with Advance PCS, L.P. in 2001.  RJN, Ex. A, B., ECF No. 19.  Advance PCS, L.P. ultimately became Caremark PCS Health, L.L.C. in 2008.  Id.

[4] Defendants' motions to seal Exhibits A through F of the Pagnillo Declaration, ECF Nos. 17, 42, are GRANTED, as Defendants have established that the confidential business information contained in such documents is sealable.

[5] The Court takes judicial notice of the documents that Defendants filed with California's Secretary of State and Delaware's Secretary of State for the purpose of effectuating the conversion of Caremark Inc. into a limited liability company and the change of Advance PCS's name to Caremark PCS, ECF No. 19, because such documents can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned and no party questions their authenticity.  See Fed. R. Evid. 201.

[6] The PCS Provider Agreement was amended after PCS Health merged with Advance PCS, L.P. in 2000; the agreement became known as the "AdvancePCS Provider Agreement."  Pagnillo Decl. ¶¶ 16-17 & Ex. B.  The Advance PCS Provider Agreement was amended in 2004 when Caremark Rx acquired AdvancePCS; the agreement became known as the "Caremark Provider Agreement."  Id. ¶ 20.  Caremark has amended the Caremark Provider Agreement several times since 2004.  Id. ¶¶ 21-24 & Ex. D.

United States District Court
Northern District of California

1    successors provided advance notice to provider pharmacies of the amendments.[7]

2          The current version of the PCS Provider Agreement and the incorporated PCS Manual is

3    the Caremark Provider Agreement and the 2011 Caremark Provider Manual ("the 2011 Provider

4    Manual").  The 2011 Provider Manual sets forth the rights and obligations of Uptown and

5    Defendants with respect to Uptown's participation in in the networks maintained by Caremark and

6    its affiliates, as well as the terms and conditions for filling prescriptions, submitting claims for

7    reimbursement, and receiving, sorting, and transmitting customer information.  Pagnillo Decl., Ex.

8    D at 13-20.  Additionally, the 2011 Provider Manual includes provisions that clearly identify

9    Caremark as the party that owns any customer data compiled, utilized, or transmitted in

10   accordance with the Caremark Provider Agreement.  See, e.g., Pagnillo Decl., Ex. D at 48.

11   ("Provider agrees that the information contained in the claims systems that was obtained by and

12   through the administration and adjudication of a claim by Provider is the property of Caremark,

13   and Provider agrees not to claim any right, title, or interest in said information.  Caremark has the

14   right to use, reproduce, and adapt any information or data obtained from Provider in any manner

15   deemed appropriate, even if such use is outside the scope of the Provider Agreement, provided

16   such use is in accordance with applicable Law."); see also id. at 13-20, 38 (providing for the

17   collection, maintenance, transmission, and use of data related to filling prescriptions).

18   **C.       The Arbitration Clause**

19         The 2011 Provider Manual contains an arbitration clause under a section entitled

20   "Miscellaneous."  Pagnillo Decl., Ex. D at 50.  It provides that:

21         **Any and all disputes in connection with or arising out of the Provider
           Agreement by the parties will be exclusively settled by arbitration** before a
22         single arbitrator in accordance with the Rules of the American Arbitration
           Association.  The arbitrator must follow the rule of Law, and may only award
23         remedies provided for in the Provider Agreement. The award of the arbitrator will

24

25   [7] See Pagnillo Decl. ¶ 17 (notice of AdvancePCS Provider Agreement); id. ¶¶ 18-19 & Ex. C
     (notice of the Caremark Provider Agreement); id. ¶ 21 (notice of 2004 Caremark Provider
26   Manual); id. ¶ 22 (notice of 2007 Caremark Provider Manual and notice that Caremark, Inc. and
     CaremarkPCS became limited liability companies); id. ¶ 23 (notice of 2009 Caremark Provider
27   Manual); id. ¶ 24 & Ex. D (notice of 2011 Caremark Provider Manual).

28

United States District Court
Northern District of California

be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof. Any such arbitration must be conducted in Scottsdale, Arizona, and Provider agrees to such jurisdiction, unless otherwise agreed to by the parties in writing. . . . **Arbitration shall be the exclusive and final remedy for any dispute between the parties in connection with or arising out of the Provider Agreement**; provided, however, that **nothing in this provision shall prevent either party from seeking injunctive relief for breach of this Provider Agreement in any state or federal court of law**. . . . The terms of this Arbitration section apply notwithstanding any other provision in the Provider Agreement.

Id. (emphasis added).

**D.     Motion to Compel Arbitration**

Defendants argue that each of the claims in the complaint must be resolved through arbitration in accordance with the arbitration clause contained in the 2011 Provider Manual, because such claims arise out of the Caremark Provider Agreement and the 2011 Provider Manual. ECF No. 18.

Uptown opposes the motion, arguing that (1) the arbitration clause is substantively and procedurally unconscionable and therefore is unenforceable; (2) none of the Defendants signed the original PCS Provider Agreement and therefore they cannot enforce it; (3) the arbitration clause was not incorporated into any Provider Agreement; and (4) the Court has jurisdiction to hear any claims for injunctive relief prior to deciding whether to compel arbitration. ECF No. 44.

**E.     Jurisdiction**

The Court has jurisdiction over this action under 28 U.S.C. § 1332(d)(2).

## II.     LEGAL STANDARD

"With limited exceptions, the Federal Arbitration Act (FAA) governs the enforceability of arbitration agreements in contracts involving interstate commerce." Kramer v. Toyota Motor Corp., 705 F.3d 1122, 1126 (9th Cir. 2013). The FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006). It requires the enforcement of an arbitration clause in a contract unless grounds exist "at law or in equity for the revocation of any contract." 9 U.S.C. § 2. An arbitration clause may be revoked by "generally applicable contract defenses, such as fraud, duress, or unconscionability." Rent-A-Center, West, Inc. v. Jackson, 130 S.Ct. 2772, 2776 (2010).

1    A party bound by an arbitration clause may bring a petition in district court to compel

2    arbitration.  9 U.S.C. § 4.  When a party files such a petition, "the district court's role is limited to

3    determining whether a valid arbitration agreement exists and, if so, whether the agreement

4    encompasses the dispute at issue.  If the answer is yes to both questions, the court must enforce the

5    agreement."  Lifescan, Inc. v. Premier Diabetic Services, Inc., 363 F.3d 1010, 1012 (9th Cir.

6    2004).  "[T]he party resisting arbitration bears the burden of proving that the claims at issue are

7    unsuitable for arbitration."  Green Tree Fin. Corp. Alabama v. Randolph, 531 U.S. 79, 91 (2000).

8    Where the claims alleged in a complaint are subject to arbitration, the Court may stay the action

9    pending arbitration.  9 U.S.C. § 3.

                                   **III.    DISCUSSION**

**A.    The Arbitration Clause is Valid and Enforceable Under the FAA**

        **1.    The Court Must Decide Whether Arbitration Clause is Valid**

        When a party to a contract challenges the validity of an arbitration clause, as opposed to

the validity of the contract containing the arbitration clause as a whole, the court must determine

whether the arbitration clause is valid and enforceable.  Nagrampa v. MailCoups, Inc., 469 F.3d

1257, 1263-64 (9th Cir. 2006) (holding that when a party challenges "not the invalidity of the

contract as a whole, but rather the arbitration provision itself, then the federal courts must decide

whether the arbitration provision is invalid and unenforceable under 9 U.S.C. § 2 of the FAA").

        Here, Uptown challenges the validity of the arbitration clause in the 2011 Provider Manual

on the ground that the clause is unconscionable.  Because Uptown's unconscionability challenge is

to the arbitration clause and not to the 2011 Provider Manual as a whole, the Court, and not the

arbitrator, must determine whether the arbitration clause is valid.

        **2.    The Validity of the Arbitration Clause Is Governed by California Law**

        When deciding whether an arbitration agreement is valid, courts "apply general state-law

principles of contract interpretation, while giving due regard to the federal policy in favor of

arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration."  Mundi

v. Union Security Life Insur. Co., 555 F.3d 1042, 1043 (9th Cir. 2009) (citations and internal

quotation marks omitted).  A district court exercising diversity jurisdiction must apply the law of

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the state in which it sits when determining the validity of an arbitration clause.  See Nagrampa.,

2   469 F.3d at 1280 (holding that district courts in California exercising diversity jurisdiction over a

3   contract dispute "must apply California law to determine whether the arbitration provision in the

4   []contract is unconscionable").  Where an arbitration agreement contains a choice-of-law clause, a

5   district court must determine whether to enforce the law chosen by the parties based on the

6   conflict-of-laws rules of the forum state.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487,

7   496 (1941).

8          Here, Defendants contend that the PCS Provider Agreement contains a choice-of-law

9   provision requiring that the agreement be construed and enforced in accordance with Arizona law,

10   and they argue that the application of Arizona law is justified because the parties' obligations

11   under the Agreement are substantially performed in Arizona.  See Supp. Pagnillo Decl. ¶ 6.

12          Uptown opposes the application of Arizona law to the question of whether the arbitration

13   agreement is valid and argues that California law should apply instead because neither the parties

14   nor the transactions at issue in the complaint have a substantial relationship to Arizona.

15          The Court concludes that it need not reach the question of whether the PCS Provider

16   Agreement's choice-of-law provision should be enforced because Defendants have not shown that

17   the Caremark Provider Agreement, which is the current iteration of the PCS Provider Agreement,

18   contains a choice-of-law provision.  The choice-of-law provision cited by Defendants is contained

19   in the 1995 PCS Provider Agreement, which has been amended multiple times since 1995.[8]

20   Without any evidence showing that the choice-of-law provision in the 1995 PCS Provider

21   Agreement continues to govern the parties' contractual relationship, the Court cannot enforce that

22   provision.[9]

23          Accordingly, because the Court has diversity jurisdiction over this action, California law

24

25   _____

26   [8] The choice-of-law provision requires that the Agreement "be construed, governed and enforced
    in accordance with the laws of the State of Arizona" unless applicable law mandates otherwise.
    See Pagnillo Dec., Ex. A at § 9.4.

27   [9] As Plaintiff points out, the test for unconscionability is the same under either California or
28   Arizona law, so it does not appear that the choice-of-law provision would affect the outcome in
    any event.

governs the determination of whether the arbitration provision in the 2011 Provider Manual is unconscionable.

### 3. Uptown Has Not Shown that the Arbitration Clause is Unconscionable

Under California law, "unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." <u>Armendariz v. Found. Health Psychcare Servs., Inc.</u>, 6 P.3d 669, 690 (Cal. 2000) (citation and internal quotation marks omitted). Procedural and substantive unconscionability "must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability. But they need not be present in the same degree." <u>Id.</u> (internal citation omitted). "In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." <u>Id.</u>

Here, Uptown provides no evidence to establish that the arbitration clause is procedurally unconscionable. Accordingly, Uptown's unconscionability challenge to the validity of the arbitration clause fails.

### a. Procedural Unconscionability

The "[p]rocedural unconscionability analysis focuses on oppression or surprise." <u>Nagrampa.</u>, 469 F.3d at 1280 (citation and internal quotation marks omitted). "Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice," while "[s]urprise involves the extent to which the supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them." <u>Id.</u> (citation omitted).

Here, Uptown argues that the arbitration clause is procedurally unconscionable on the grounds that (1) "every retail pharmacy must do business with CVS Caremark's PBM business," as "CVS Caremark is the largest provider of prescriptions and related health services in the nation"; (2) Caremark presented the arbitration clause to Uptown on a take-it-or-leave-it basis without providing Uptown any opportunity to negotiate it; (3) Caremark reserved the right to unilaterally modify the terms of the arbitration clause; (4) the arbitration clause is in the "middle

1  of a 217-page document" and does not contain an opt-out clause or an explanation of the rights

2  that Uptown gave up in light of the arbitration clause. Mot. at 9-10.

3        The Court concludes that Uptown has failed to show that the arbitration clause is

4  procedurally unconscionable.

5        First, Uptown's unconscionability arguments focus on Caremark and on the amendments

6  that Caremark and its affiliates have made to the Caremark Provider Agreement and the Caremark

7  Provider Manual. Uptown ignores, however, that an arbitration clause has been a part of

8  Uptown's contractual relationship with PCS Health and its successors continually for the last

9  eighteen years. Indeed, the 1995 PCS Provider Agreement, which was drafted and implemented

10  by a non-Caremark entity, contained provisions that are nearly identical to the ones Uptown now

11  finds objectionable in the 2011 Provider Manual, namely an arbitration provision without an

12  express opt-out clause and provisions that allow PCS Health to unilaterally amend the Agreement

13  at any time as long as it gives advance notice to the provider pharmacies.[10] Pagnillo Decl., Ex. A

14  ¶¶ 1.3, 9.5. Uptown provides no evidence to establish either the existence of a power imbalance

15  between Uptown and PCS Health or that Uptown lacked any meaningful choice when it decided to

16  enter into a contract containing an arbitration clause with PCS Health in 1995.

17        Second, Uptown's unconscionability challenges to the Caremark Provider Agreement and

18  the 2011 Provider Manual are conclusory and unsupported by the evidence before the Court.

19  Uptown complains of Caremark's superior bargaining power but it provides no evidence to show

20  that the realities of the industry in which it operates compel it to do business with Caremark on

21  Caremark's terms. The only fact that Uptown has offered on this issue is that Caremark is the

22  largest PBM in the country. There is no evidence regarding Caremark's market share, the

23  existence and market share of competitors, the existence of alternative retail partners, or the other

24  mechanisms, if any, by which patients choose a pharmacy. Without such information, the Court

25  cannot conclude, solely on the basis of Caremark's being the largest PBM, that there was no real

26  negotiation or that Uptown had no meaningful choice. At best, Caremark's leadership position

27

28    [10] Both of these provisions were written in plain language and in conspicuous typeface and can be readily found in the 12-page PCS Provider Agreement.

United States District Court
Northern District of California

1    may explain why Uptown *wanted* to do business with Caremark, but it does not compel the

2    conclusion that Uptown *had* to do business with Caremark.

3            Uptown also argues that the arbitration clause in the 2011 Provider Manual is

4    unconscionable because Caremark presented it to Uptown on a take-it-or-leave it basis and

5    because Caremark reserved the right to unilaterally modify the clause.  This argument is

6    unpersuasive, given that Caremark complied with its contractual obligation to give advance notice

7    to Uptown each time it amended the Caremark Provider Agreement.  See Pagnillo Decl. ¶¶ 16-24;

8    Supp. Pagnillo Decl. ¶¶ 4-5.  The purpose of the advance-notice requirement presumably was to

9    give provider pharmacies an opportunity to exit their contractual relationship with Caremark if

10    they objected to the proposed amendments.  Also, Uptown has submitted no evidence to show that

11    it could not have negotiated to alter the terms of the proposed amendments, or that it could not

12    have terminated its business relationship with Caremark and established a relationship with an

13    alternative partner in the event that Caremark refused to negotiate.

14            Uptown further contends that the arbitration clause in the 2011 Provider Manual is

15    unconscionable because it "lurks unremarkably in the middle of a 217-page document" and does

16    not contain an express opt-out clause or an explanation of the rights that Uptown would give up in

17    light of the arbitration clause.  This argument is unconvincing for two reasons.  First, upon review

18    of the 2011 Provider Manual, the Court cannot conclude that the arbitration clause is

19    "unremarkable" or hidden or that it does not contain an explanation of the implications of its

20    existence.  While Uptown is correct in noting that the 2011 Provider Manual is more than 200

21    pages, the Manual contains a very thorough table of contents that very clearly states that the

22    arbitration clause at issue is located on pages 49 and 50 of the Manual.  The arbitration clause

23    itself in written in reasonably sized text and in plain language and explains that "[a]rbitration shall

24    be the exclusive and final remedy for any dispute between the parties in connection with or arising

25    out of the Provider Agreement; provided, however, that nothing in this provision shall prevent

26    either party from seeking injunctive relief for breach of this Provider Agreement in any state or

27    federal court of law."  Pagnillo Decl., Ex. D at 50.  Second, while Uptown is correct that the

28    arbitration clause does not contain an express "opt-out" clause, Uptown has not shown that the

United States District Court
Northern District of California

1    advance-notice requirement for proposed amendments discussed above is not the functional

2    equivalent of an opt-out clause.

3           Finally, the authorities that Uptown cites in support of its procedural unconscionability

4    arguments are not on point, because they deal with situations involving unsophisticated

5    individuals who were presented with take-it-or-leave-it contracts by parties who had

6    overwhelming bargaining power.  See, e.g., Bowlin v. Goodwill Indus. of Greater E. Bay, Inc., 12-

7    cv-01593 NC, 2013 WL 269131, at *4 (N.D. Cal. Jan. 24, 2013) (finding procedural

8    unconscionability because individual employee was presented with a form contract and was

9    denied the opportunity to negotiate the contract's terms by his employer); Sparks v. Vista Del Mar

10   Child & Family Servs., 207 Cal. App. 4th 1511, 1523 (Cal. Ct. App. 2012) (finding procedural

11   unconscionability because individual employee was presented with an arbitration provision buried

12   in an employee handbook); Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1284 (9th Cir. 2006)

13   (finding minimal procedural unconscionability because franchisor presented a contract to an

14   unsophisticated first-time franchisee on a take-it-or-leave-it basis and franchisor had

15   "overwhelming" bargaining power).  The agreement here involves two business entities, and

16   Uptown provides no evidence to show that it was in any way unsophisticated or that PCS Health

17   or its successors, including Caremark, had overwhelming relative bargaining power.

18                  **b.      Substantive Unconscionability**

19          Because Uptown has not shown that the arbitration clause is procedurally unconscionable

20   to any degree, the court need not inquire into whether the agreement is substantively

21   unconscionable, as both procedural and substantive unconscionability must be established for an

22   unconscionability challenge to succeed.  See Kilgore v. KeyBank, Nat. Ass'n, 673 F.3d 947, 964

23   (9th Cir. 2012) ("Because we hold that the arbitration clause in the parties' contract is not

24   procedurally unconscionable, we need not address whether the terms of that clause are

25   substantively unconscionable.").

26          **4.      The Arbitration Clause Can Be Enforced Against Uptown**

27                  **a.      Caremark, L.L.C. Is the Successor to PCS Health**

28          Uptown argues that the arbitration clause cannot be enforced against it because Defendants

                                                      11

United States District Court
Northern District of California

1    have not shown that Caremark, L.L.C. is a successor to PCS Health with respect to the 1995 PCS

2    Provider Agreement.

3         The evidence submitted by Defendants shows (1) that PCS Health was owned by Rite Aid

4    Corporation until it merged with Advance PCS, L.P. in 2001, and that Advance PCS, L.P.

5    ultimately became Caremark PCS Health, L.L.C. in 2008, RJN, Ex. A, B., ECF No. 19; (2) that

6    Caremark, Inc. and Caremark PCS, Inc. amended the AdvancePCS Provider Agreement, which

7    was the immediate successor to the 1995 PCS Provider Agreement, after Caremark Rx acquired

8    Advance PCS in 2004, Pagnillo Decl. ¶¶ 18, 22 & Ex. C; and (3) that Caremark gave notice to

9    Uptown that the resulting Caremark Provider Agreement was with Caremark Inc. and Caremark

10   PCS, Inc., which ultimately became Caremark, L.L.C. and Caremark PCS, L.L.C., respectively.

11   Pagnillo Decl. ¶¶ 14-24 & Ex. C.

12        Based on this evidence, the Court concludes that both Caremark, L.L.C. and Caremark

13   PCS, L.L.C. are successors to PCS Health with respect to the 1995 PCS Provider Agreement and

14   that these entities can enforce the Agreement.

15              **b.       The Provider Manuals Were Incorporated into the Provider**

16                         **Agreements**

17        Uptown argues that the arbitration clause at issue cannot be enforced against it because

18   "there is no provision that clearly purports to incorporate any 'Caremark Provider Manual' into the

19   Provider Agreement, and Defendants have not submitted any evidence that an original 'PCS

20   Manual' existed in the first place that could have subsequently been amended."  Opp'n at 13.

21        "Under California law, for one document to incorporate another document by reference,

22   [t]he reference to the incorporated document must be clear and unequivocal and the terms of the

23   incorporated document must be known or easily available to the contracting parties."  Cariaga v.

24   Local No. 1184 Laborers Int'l Union of N. Am., 154 F.3d 1072, 1074 (9th Cir. 1998) (citation and

25   internal quotation marks omitted).

26        Here, Defendants have submitted evidence showing that the PCS Manual was clearly and

27   unequivocally incorporated into the original 1995 PCS Provider Agreement.  See Pagnillo Decl.,

28   Ex. A ¶ 9.7 (providing that the "Entire Agreement" consists of "[t]his Agreement, its schedules,

United States District Court
Northern District of California

12

and the PCS Manual . . .") (emphasis added).  Defendants also have shown that the Caremark

Provider Manual, which is an amended version of the PCS Manual, also was clearly and

unequivocally incorporated into the Caremark Provider Agreement and that Caremark sent copies

of the Caremark Provider Manual to Uptown.  See Supp. Pagnillo Decl., Ex. F (letter clarifying

that Caremark Provider Agreement "includes the Caremark provider Manual"); see also Pagnillo

Decl. ¶¶ 21-24 (declaring that Caremark sent to pharmacy providers various versions of the

Caremark Provider Manual).

### c.        Nonparties Can Compel Arbitration under California Law

Uptown argues that Defendants CVS Caremark, CVS Pharmacy, and Caremark Rx cannot

enforce the arbitration clause at issue with respect to the claims that Uptown has asserted against

them because they are not signatories to any of the Provider Agreements.  Defendants counter that,

under the doctrine of equitable estoppel, each of them can compel the arbitration of Uptown's

claims even though Caremark, L.L.C is the only Defendant who is a party to the 2011 Provider

Manual.

"Generally, the contractual right to compel arbitration may not be invoked by one who is

not a party to the agreement and does not otherwise possess the right to compel arbitration."

Kramer v. Toyota Motor Corp., 705 F.3d 1122, 1126 (9th Cir. 2013) (citation and internal

quotation marks omitted).  Yet, "[t]he United States Supreme Court has held that a litigant who is

not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state

contract law allows the litigant to enforce the agreement."  Id. at 1128 (citation omitted).

Under California law, "where a nonsignatory seeks to enforce an arbitration clause, the

doctrine of equitable estoppel applies in two circumstances: (1) when a signatory must rely on the

terms of the written agreement in asserting its claims against the nonsignatory or the claims are

intimately founded in and intertwined with the underlying contract, and (2) when the signatory

alleges substantially interdependent and concerted misconduct by the nonsignatory and another

signatory and the allegations of interdependent misconduct [are] founded in or intimately

connected with the obligations of the underlying agreement."  Id. at 1128-29 (internal citations and

quotation marks omitted).[11]  The underlying purpose of the doctrine of equitable estoppel is to

"preclude[] a party from claiming the benefits of a contract while simultaneously attempting to

avoid the burdens that contract imposes."  Mundi, 555 F.3d at 1045 (citation and internal

quotation marks omitted).

    Here, the application of equitable estoppel is justified with respect to three out of the four

claims asserted in the complaint.

    Uptown's claims for (1) violations of the UTSA, (2) violations of the unlawful prong of

the UCL, and (3) IPEA, are founded and intertwined with the Caremark Provider Agreement.

Each of these claims is predicated on Defendants' alleged misappropriation of the customer

information that Uptown disclosed to Caremark by virtue of Uptown's inclusion in Caremark's

PBM networks.[12]  Uptown's inclusion in Caremark's PBM networks, in turn, is governed by the

Caremark Provider Agreement.  The terms of the Caremark Provider Agreement expressly

addresses the use, dissemination, and ownership of the customer information that Defendants

allegedly misappropriated.  See, e.g., Pagnillo Decl., Ex. D at 48 ("Provider agrees that the

information contained in the claims systems that was obtained by and through the administration

and adjudication of a claim by Provider is the property of Caremark, and Provider agrees not to

claim any right, title, or interest in said information.  Caremark has the right to use, reproduce, and

adapt any information or data obtained from Provider in any manner deemed appropriate, even if

such use is outside the scope of the Provider Agreement, provided such use is in accordance with

---

[11] The Court applies California law to the equitable estoppel issue because this action invokes the Court's diversity jurisdiction, and, as discussed above, Defendants have not shown that the operative Caremark Provider Agreement contains a choice-of-law provision.  Moreover, Plaintiff and Defendants all agree that the Court should apply the test set forth in Kramer v. Toyota Motor Corp., 705 F.3d 1122 (9th Cir. 2013).

[12] See, e.g.,Compl. ¶ 81 (UTSA claim) ("Such misappropriation of plaintiff's and Class members' trade secrets and confidential patent/customer information violates the UTSA."); id. ¶ 85 (Unlawful UCL claim) ("Defendants have violated § 17200's prohibition against engaging in 'unlawful' acts or practices by, as alleged above, misappropriating plaintiff's and Class members' trade secrets . . . in violation of UTSA"); id. ¶¶ 104-105 (IPEA claim) ("In misappropriating plaintiff's and Class members' proprietary information and data for its financial gain . . . Defendants . . . disrupted the existing or prospective relationship between plaintiff and Class members and defendants' beneficiaries.").

United States District Court
Northern District of California

1    applicable Law."); see also id. at 13-20, 38 (providing for the collection, maintenance,

2    transmission, and use of data related to filling prescriptions and submitting claims for

3    reimbursement).

4        To prevail on a claim for misappropriation of trade secrets, a plaintiff must prove: "(1) the

5    existence of a trade secret, and (2) misappropriation of the trade secret." See AccuImage

6    Diagnostics Corp v. Terarecon, Inc., 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003) (citing Cal. Civ.

7    Code § 3426.1(b)).  Misappropriation is defined in part as the "[d]isclosure or use of a trade secret

8    of another without express or implied consent by a person who . . . [a]t the time of disclosure or

9    use, knew or had reason to know that his or her knowledge of the trade secret was . . . [a]cquired

10   under circumstances giving rise to a duty to maintain its secrecy or limit its use." See Cal. Civ.

11   Code § 3426.1(b)(2).  Here, to prevail on each of the misappropriation-based claims, Uptown will

12   have to prove that Caremark disclosed the customer data at issue without authorization despite

13   knowing that it had a duty to maintain the data's secrecy or to limit its use.  The question of

14   whether Caremark was to any extent barred from disclosing or using Uptown's customer data

15   must be answered by looking at the terms of the Caremark Provider Agreement, because that

16   contract explicitly governs the collection and use of such information and because it provides the

17   underlying basis for Uptown's disclosure of such information.  Uptown must establish that

18   Caremark's use of that information exceeded the scope of use permitted under the Provider

19   Agreement.  As Uptown's misappropriation claims are "intimately founded and intertwined with

20   the underlying contract obligations," and because Uptown alleges that Defendants acted in concert

21   in misappropriating Uptown's customer data, the application of equitable estoppel is justified with

22   respect to these claims.[13] Kramer, 705 F.3d at 1129 (citation omitted).  Accordingly, nonsignatory

23   Defendants may compel the arbitration of these claims.

24       Uptown does not dispute that the Caremark Provider Agreement governs its inclusion in

25

26   _____

27   [13] Uptown alleges that Defendants engaged in substantially concerted misconduct when they
     misappropriated the customer data at issue for their own financial gain.  See, e.g., Compl. ¶ 82
     (UTSA claim) ("Defendants' conduct discussed above proximately caused and is causing
28   damage"); id. ¶ 86 (Unlawful UCL claim) ("Defendants have violated § 17200"); id. ¶ 99 (IPEA
     claim) ("Defendants interfered with an actual prospective economic relationship").

United States District Court
Northern District of California

Caremark's PBM networks. Instead, Uptown argues that all of its claims are independent of the

Caremark Provider Agreement because it "never mentions the Provider Manual or any of its

provisions in the Complaint, and never mentions the Provider Agreement other than to disavow

the notion that Plaintiff's claims arise thereunder." Opp'n at 19. That Uptown never refers to the

Caremark Provider Agreement by name in the complaint is not dispositive of the question of

whether Uptown's claims are intertwined with the Agreement, because the complaint is replete

with implicit references to that contract.[14] Moreover, the dependent relationship between

Uptown's misappropriation claims and the Provider Agreement is evident from the simple fact

that, absent the Provider Agreement, Uptown would have no claims against Defendants with

respect to the customer information at issue, because in that scenario, Uptown would not have

been required to disclose such information to Defendants.

   In contrast, Uptown's claim for violations of the unfair prong of the UCL is not founded or

intimately intertwined with the Caremark Provider Agreement. This claim is premised on

Defendants' exclusion of Uptown and the putative class members from certain Maintenance

Choice networks that Caremark's PBM branch established with third-party insurers and plan

sponsors. Compl. ¶¶ 53-65. As a result of this alleged exclusion, Uptown and the putative class

members have allegedly suffered monetary losses because they cannot provide pharmacy services

to the members of such networks. Id. Defendants contend that this claim arises out of the

Caremark Provider Agreement because a provision in the Agreement states that Caremark "may

make available to Provider the opportunity to participate in Caremark or Plan Sponsor Networks."

See Pagnillo Decl., Ex. D at 21; Mot. at 12. Because this provision does not create any rights or

duties with respect to the Maintenance Choice networks, the Court cannot conclude that Uptown's

---

[14] See, e.g., Compl. ¶ 14 ("Uptown Drug is a qualified provider under defendants' various pharmacy benefit management programs."); id. ¶ 27 ("In order to adjudicate the patient's claim, CVS Caremark requires that the retail pharmacy supply several pieces of information to CVS Caremark . . . for claims processing"); id. ¶ 43 ("Plaintiff's and Class members' pharmacy patient lists, including the demographic information and prescription history of each patient, are proprietary and confidential. Plaintiff and Class Members only disclose such information to CVS Caremark's PBM operation for the purpose of claims adjudication, and the Pharmacy Services segment is required to keep such information confidential, and to use it only for the authorized purpose of pharmacy benefits management.").

United States District Court
Northern District of California

1   claim has any significant foundation in that provision or in the Agreement as a whole.

2   Accordingly, nonsignatory Defendants may not compel the arbitration of this claim.

3   **B.      The Arbitration Clause Encompasses Uptown's Misappropriation-Based Claims**

4         "Under established law, [t]he question whether the parties have submitted a particular

5   dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination

6   [u]nless the parties clearly and unmistakably provide otherwise."[15]  In re Van Dusen, 654 F.3d

7   838, 843 (9th Cir. 2011) (citations and internal quotation marks omitted).  To fall within the scope

8   of an arbitration clause, a claim need only "touch matters covered by the contract containing the

9   arbitration clause and all doubts are to be resolved in favor of arbitrability." Simula, Inc. v.

10  Autoliv, Inc., 175 F.3d 716, 721 (9th Cir. 1999) (citation omitted).

11        Here, the arbitration clause provides that "[a]ny and all disputes in connection with or

12  arising out of the Provider Agreement by the parties will be exclusively settled by arbitration . . ."

13  Pagnillo Decl., Ex. D at 50.

14        As discussed above, Uptown's misappropriation-based claims are founded on the

15  Caremark Provider Agreement.  As such, they arise out of the Provider Agreement and thus fall

16  within the scope of the arbitration clause.  For this reason, and because each of the Defendants

17  may move to compel the arbitration of these claims regardless of whether they signed the

18  Agreement, Defendants' motion to compel the arbitration of these claims is GRANTED.

19        In contrast, Uptown's claim under the unfair prong of the UCL does not touch matters

20  covered by the Provider Agreement and therefore falls outside of the arbitration clause.  For this

21  reason, and because nonsignatory Defendants cannot compel the arbitration of this claim,

22  Defendants' motion to compel arbitration of this claim is DENIED.

23  **C.      The Action is Stayed Pending Arbitration**

24        The FAA provides that "upon any issue referable to arbitration under an agreement in

25  _____

26  [15] Defendants argue that the parties delegated the question of arbitrability to the arbitrator by
    expressly incorporating the rules of the American Arbitration Association in the arbitration clause.

27  Mot. at 10. Because the Ninth Circuit has not addressed in a published opinion the question of
    whether such incorporation is sufficient to submit the question of arbitrability to the arbitrator, and

28  because there is disagreement among the lower courts on this issue, the Court concludes that the
    question of arbitrability in this case is for judicial determination.

United States District Court
Northern District of California

United States District Court
Northern District of California

writing for such arbitration, the court in which the suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]"  9 U.S.C. § 3.

Defendants move to stay the litigation of any claims that the Court finds unsuitable for arbitration until the arbitration of all other claims is completed.

Uptown opposes Defendants' request and urges the Court to "maintain its jurisdiction over this case in order to consider requests for injunctive relief, even over those claims which the Court may find are suitable for arbitration."  Opp'n at 24.

Having concluded that all misappropriation-based claims are subject to arbitration, the Court finds that a stay of the remaining claim for violations of the unfair prong of the UCL is warranted.  See Kilgore, 673 F.3d at 955 ("The federal case must be stayed while the parties proceed to arbitration.").

The Court will not consider Uptown's requests for injunctive relief at this time, as such requests are wholly derivative of the claims asserted in the complaint and thus are subject to the same arbitration analysis and conclusions as the claims from which they stem.[16]  See Compl. ¶¶ 109-115 (requesting permanent injunction (1) requiring Defendants to admit Uptown and the putative class members into the Maintenance Choice networks; and (2) barring Defendants from disclosing or otherwise using Uptown's customer information except for the purpose of adjudicating Uptown's benefit claims).  Consequently, all requests for injunctive relief that derive from Uptown's misappropriation-based claims must be resolved through arbitration, and the request for injunctive relief in connection with the remaining UCL claim is stayed pending arbitration.

/ / /

---

[16] The arbitration clause contains an exception, which provides that that "nothing in this provision shall prevent either party from seeking injunctive relief for breach of this Provider Agreement in any state or federal court."  Pagnillo Dec., Ex. D at 50.  Uptown's requests for injunctive relief do not fall within this exception to arbitration, because the injunctive relief that Uptown seeks is not meant to address any breaches of the Provider Agreement.

### IV.    CONCLUSION

Defendants' motion to compel arbitration is granted in part and denied in part.  The motion is granted with respect to Uptown's claims for (1) violations of the UTSA, (2) violations of the unlawful prong of the UCL, and (3) interference with prospective economic advantage.  The motion is denied with respect to Uptown's claim for violations of the unfair prong of the UCL.  This action is stayed pending the completion of arbitration.

**IT IS SO ORDERED**.

Dated: July 22, 2013

_____
JON S. TIGAR
United States District Judge